IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division


FILED
JUL 3 0 2010
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

United States of America, )
)
Plaintiff, )
)
v. )
) Civil Action No.: 1:10-cv-71
$145,850 U.S. Currency, )
)
Defendant. )

## Memorandum Opinion

This matter comes before the Court on Claimant Martin Fitzgerald Arrington's Motion to Suppress and Motion to Dismiss (Dkt. No. 8). The Court held a hearing on the Motions on June 18, 2010. Upon consideration of the Motions and for the reasons that follow, Arrington's Motions shall be denied.

### I. Background

This case arises from the Metropolitan Washington Airports Authority ("MWAA")'s seizure of the *in rem* defendant currency from Arrington's luggage as he attempted to pass through security at Dulles International Airport ("Dulles").

The Government filed its Complaint *in rem* for forfeiture of the currency on January 26, 2010. Arrington filed an Answer and Motions to Dismiss and Suppress (the focus of this Memorandum) on March 19, 2010.

### II. Facts from the June 18, 2010 Suppression Hearing

At the June 18 hearing, the Court received testimony from Detective Ryan Harrison. Harrison is currently assigned as an investigator and detective with the MWAA Police Department at Dulles and has been certified by the Drug Enforcement Administration's

1

Operation Jetway School, which specializes in training for criminal interdiction in airport terminals. At the June 18 hearing, Detective Harrison testified to the facts that follow.

On September 10, 2009, authorities stopped the claimant, Martin Arrington, at a Transportation Security Administration ("TSA") screening checkpoint in Dulles. Tr. at 4-5. Arrington, planning to board a plane to Los Angeles, California, had placed his black carry-on suitcase on the x-ray scanning belt at the checkpoint. The x-ray scan of his carry-on suitcase revealed "unknown masses" in the suitcase. Tr. at 14. TSA agents at the checkpoint opened the bag to conduct a hand search to investigate the nature of the masses. *Id.* Discovering that the masses were bundles of large amounts of U.S. currency, the agents alerted uniformed MWAA officers positioned nearby. Tr. at 15.

One of these uniformed officers, Corporal Abusi, contacted Detective Harrison. When Detective Harrison arrived at the checkpoint, he found Arrington and Corporal Abusi standing next to Arrington's opened suitcase which visibly contained an "excessive amount" of U.S. currency. Tr. at 5-6. Bound in large bundles by rubber bands, the currency had been concealed in ripped-out magazine pages taped to the outside of the bundles before the TSA agents tore through the pages. Tr. at 15. Brand new, folded T-shirts lined the top of the suitcase. *Id.* Detective Harrison took photographs of the opened suitcase (Exhibits 1 and 2), then proceeded to question Arrington about the currency. Tr. at 6-7.

Detective Harrison first asked Arrington where the currency had come from and where he planned to travel, to which Arrington answered that he was traveling to California to purchase cars. Tr. at 7. When asked why he was traveling with a large amount of money instead of using cashier's checks, Arrington responded that he does his business in cash. *Id.* After further questioning, Arrington told Harrison that he was heading to Los Angeles to buy cars at an auto

2

auction, but was unable to provide any specific information as to the auction's location, nor was he able to provide any other details about his business plans in California. *Id.*

Arrington was also indefinite about the amount of money in his luggage. Arrington alternately told officers that there was "$143,000," "over $150,000," and "less than a million dollars" in the suitcase. Tr. at 7-8. When Detective Harrison asked for documentation regarding the source of the money, Arrington looked through his briefcase, appearing to search through paperwork, before closing it without answering. Tr. at 8. He then told Detective Harrison that he didn't want to answer any more questions, and asked if he was free to leave. *Id.* Harrison told him he could leave at any time. *Id.*

At this point, Arrington began walking towards the exit of the security screening checkpoint, alongside Detective Harrison, who was simultaneously relating information to another detective, Sergeant Graft. *Id.* Harrison also asked Corporal Abusi to conduct a background check on Arrington's prior criminal history. *Id.* Harrison, still walking alongside Arrington, then received a phone call from Detective Steve Smith of the DEA Task Force Group, who told him that Arrington had a prior arrest in Washington, D.C. for possession of marijuana with intent to distribute in the year 2000. Tr. at 8-9. Detective Harrison then asked Arrington if he had ever been arrested before, to which Arrington replied that he had been once when he was 16 for a minor assault. Tr. at 9. Harrison clarified, asking if Arrington had ever been arrested for anything involving drugs or illegal narcotics. *Id.* Arrington replied, "No." *Id.*

Meanwhile, Detective Smith was also running a check on Arrington's background through the El Paso Intelligence Center ("EPIC"). *Id.* The EPIC database indicated that county police had detained Arrington in a narcotics-related traffic stop in Phoenix, Arizona in March 2007. *Id.* During that stop, a county deputy discovered marijuana inside Arrington's car, and

seized U.S. currency found in the vehicle as a result. Tr. at 9-10. The report further indicated that while being questioned during the stop, Arrington told the county deputy that he had never been previously arrested for any drug-related offense, failing to mention his 2000 arrest in the District of Columbia. Tr. at 10.

Detective Smith called and relayed the details of the Phoenix seizure to Detective Harrison while he and Arrington were still walking through the airport terminal. *Id.* Harrison then stopped Arrington and advised him that he was seizing the currency because he believed it to be the proceeds of illegal activity. *Id.* Harrison told Arrington that he remained free to accompany him to the police station, where he would provide Arrington with a receipt for the currency. Tr. at 11.

### III. Motion to Suppress

Arrington argues that the seizure of his luggage violated the Fourth Amendment's prohibition against unreasonable searches and seizures, rendering the evidence seized inadmissible under the exclusionary rule. The Court disagrees.

Pursuant to 21 U.S.C. § 881(a)(6), all currency furnished in exchange for illegal drugs, all proceeds traceable to an exchange for illegal drugs, and all currency used to facilitate illegal drug trafficking are subject to forfeiture. The rules governing civil forfeiture proceedings are provided in 18 U.S.C. § 983 and the Rule G of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims. Under the Civil Asset Forfeiture Reform Act ("CAFRA"), in forfeiture actions brought under 18 U.S.C. § 983, the government bears the burden of proof at trial to establish, by a preponderance of the evidence, that the property is subject to forfeiture.

Additionally, the Fourth Amendment, and by extension, the exclusionary rule, applies to civil forfeiture cases. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1965); *United States v. $78,850.00 in U.S. Currency*, 444 F.Supp.2d 630, 635 (D.S.C. 2006); *see also* 18 U.S.C. § 981(b)(2)(B) ("[A] seizure may be made without a warrant if-- (B) there is probable cause to believe that the property is subject to forfeiture and-- (i) the seizure is made pursuant to a lawful arrest or search; or (ii) another exception to the Fourth Amendment warrant requirement would apply. . . "). Thus, Arrington may challenge the legality of the seizure of his luggage much like a defendant in a criminal case does by making a motion to suppress. *See, e.g., United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099 (11th Cir. 2004). However, "the mere fact that property was illegally seized does not immunize that property from forfeiture." *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 450 (9th Cir. 1983). *See also* Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims ("Suppression does not affect forfeiture of the property based on independently derived evidence").

### a. Detective Harrison had probable cause to seize Arrington's suitcase as he exited Dulles on September 10, 2009.

Usually, the seizure of personal property is "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).[1] Among the exceptions carved out from this warrant requirement, however, is the allowance for the warrantless seizure of contraband identifiable by authorities from a lawful vantage point, otherwise known as the "plain view" doctrine. *Payton v. New York*,

---

[1] While standing is always a preliminary question in a Fourth Amendment inquiry, *see, e.g., Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978), there is no issue here that Arrington has standing to challenge the constitutionality of the seizure of his luggage.

445 U.S. 573, 587 (1980) ("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.").

Thus, contraband found in plain view during the course of an otherwise constitutional search is perfectly permissible under the Fourth Amendment. *See, e.g., United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994). More specifically, the plain view doctrine excuses the issuance of a warrant prior to seizure when: "(1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010).

Arrington does not dispute that the initial inspection of his bags was constitutional. *See United States v. DeAngelo*, 584 F.2d 46, 47-48 (4th Cir. 1978) (holding that an airport x-ray search is a lawful search and also noting that a suspect's voluntary entrance into a security line acts as consent to the search); *see also, e.g., United States v. Marquez*, 410 F.3d 612, 616 (9th Cir. 2005), *opinion amended on other grounds*, 2005 WL 1661572 (9th Cir. July 18, 2005); *U.S. v. Lopez-Pages*, 767 F.2d 776, 778 (11th Cir. 1985). Thus, Arrington tacitly agrees that authorities were in a lawful vantage point to view the undefined masses in his suitcase. Well within the scope of this lawful search, the TSA agents permissibly inquired further and discovered that the masses were separately-wrapped bundles of money. *Id.* Provided that authorities had probable cause to believe the cash was contraband, the subsequent seizure of the cash visible in plain view was constitutional. *See Payton*, 445 U.S. at 587.

Rather than attacking the initial search, Arrington argues that Detective Harrison lacked probable cause to seize the luggage as he attempted to exit the airport. Arrington argues that the

6

extent of the airport authorities' knowledge before the seizure was limited to the following facts: Arrington was traveling with an unspecified amount of money; he informed them he was in the car purchasing business; he was carrying the cash for that purpose; and he refused to answer further questions about his travel plans. Detective Harrison's testimony at the Suppression Hearing, however, indicates that authorities knew a great deal more.

After opening the suitcase and unwrapping the bundles at the security checkpoint, the TSA agents discovered that Arrington was carrying a large amount of cash wrapped in a suspicious manner. Specifically, the currency was wrapped in magazine pages and separated by what appeared to be newly purchased, white t-shirts. *See, e.g., United States v. $61,433.04 U.S. Currency*, 894 F. Supp. 906, 921 (E.D.N.C. 1995) ("[T]he unusual presence of thousands of dollars stacked on one's dining room table would lead police officer to a reasonable suspicion that criminal activity was afoot."); *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 981 (9th Cir. 2002) (recognizing that a large amount of cash wrapped unusually in cellophane was "strong evidence that the money was furnished or intended to be furnished in return for drugs" (citations omitted)); *United States v. $159,880.00 in U.S. Currency*, 387 F. Supp. 2d 1000, 1013 (S.D.Iowa 2005) (noting that where police found $159,880 separated into 21 bundles wrapped by rubber bands and stored in a plastic bag stuffed inside a duffel bag, such a "method of transporting funds provides further evidence that the cash was connected with drug activity"). That Arrington was unable to offer a legitimate explanation of the source of the large amount of currency only served to further confirm Detective Harrison's suspicions. *See United States v. $147,900.00 in U.S. Currency*, 2009 WL 903356 at *9 (M.D.N.C. Mar. 31, 2009) (holding that a claimant's "contentions that [seized currency] constitutes legitimate business proceeds is belied by his inability to produce any business or tax records regarding the source of this income").

Arrington then gave evasive answers regarding his destination in California, and though he claimed to be traveling for the purposes of his car dealing business, he was unable to offer specifics as to where he planned to purchase cars. *See United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1217 (9th Cir. 2001) (noting that a suspect's inability to "answer simple questions about his last job, the address of the person he claimed to be visiting, and the name or address of the dealership from which he intended to buy [an automobile]... tended to support an inference that the money was drug-related.").

Finally, and importantly, before seizing the suitcase, Detective Harrison learned from the DEA and other sources that Arrington's record included a prior arrest for possession of marijuana with intent to distribute in 2000 and an incident in Phoenix, Arizona in March 2007 during which authorities seized currency in Arrington's possession on suspicion of its connection to drug activity. Tellingly, when asked if he had been arrested before, Arrington mentioned only an arrest when he was 16 years old, omitting the drug-related 2000 arrest.

The importance of this fact is two-fold. First, Arrington's drug-related arrest itself is probative of the money's likely connection to drug-related activity. *See Id.* at 1217("Evidence of a prior drug conviction is probative of probable cause."); *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988) ("Evidence of [suspect's] 1973 conviction for possession of a controlled substance for sale, his 1983 conviction for possession, and his arrest for possession in 1984 are circumstances demonstrating more than a mere suspicion of his involvement in illegal drug transactions"). Second, Arrington's omission of the arrest indicates his desire to conceal that fact from Detective Harrison, further justifying Harrison's suspicions. Those suspicions were solidified when Harrison learned of Arrington's prior possession of

8

suspected drug money in 2007. Armed with this information in its totality, Harrison had probable cause to seize the cash as contraband.

The only remaining wrinkle is the requirement under the plain view doctrine that it be "immediately apparent" to authorities that the property in question is contraband. *See Arizona v. Hicks*, 480 U.S. 321 (1987). That requirement provides that if authorities "lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object- i.e., if its incriminating character [is not] 'immediately apparent,' the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citations and internal quotation marks omitted).

However, this Circuit has "rejected the argument that an item's illegality must be apparent to the searching officer at the precise moment that he spots it." *United States v. Kelly*, 276 Fed.Appx. 261, 264 (4th Cir. 2007). If the "immediacy" requirement were construed too stringently "it would mean that unless searching officers had probable cause to grasp the incriminating character of an item not specifically covered by a search warrant at the precise moment they first spotted it, its seizure would become unlawful for the duration of the search, regardless of information lawfully acquired later in the search." *United States v. Garces*, 133 F.3d 70, 75 (D.C. Cir. 1998). "Thus, although the phrase 'immediately apparent' sounds temporal, its true meaning must be that the incriminating nature of the item must have become apparent, in the course of the search, without the benefit of information from any unlawful search or seizure." *Id.*; *see also United States v. Jackson*, 131 F.3d 1105, 1109-10 (4th Cir.1997) (holding that a seizure of drug paraphernalia, even though the investigating officer left the room and returned to view it a second time before recognizing the incriminating nature of the paraphernalia, was permissible under the plain view doctrine); *Green*, 599 F.3d at 376 (holding

that "the incriminating character of what looks to be a large sum of money in a bag under a bed may not be immediately apparent. However, given the reason that the officers secured the arrest warrant and went to [the suspect's] residence in search of him, the money's incriminating character, as probable proceeds from narcotics transactions and thus the fruit of illegal activity, could be immediately inferred.").

In other words, the immediacy requirement contained within the plain view doctrine largely seeks to ensure that no further privacy interest is infringed upon in the course of a seizure by subsequent unlawful searches, rather than imposing a strict time limit on an officer's investigation.

Here, although the majority of facts serving as the basis for Detective Harrison's probable cause to seize the currency were not discovered until after the bundles of cash came into plain view, Harrison's investigation implicated no further infringement of Arrington's privacy interests relative to the property itself. That is, Detective Harrison gathered no information from any additional unlawful search. Rather, Harrington's seizure of the currency occurred in the course of the original lawful search and within the lawful allowances of the plain view exception.[2]

Accordingly, Arrington's Motion to Suppress must be denied.

---

[2] That Arrington zipped up his suitcase and began to exit the airport is immaterial to whether the plain view justification for seizure continued to apply. *See Illinois v. Andreas*, 463 U.S. 765, 771-73 (1983) ("It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain [contraband or illegal materials]. No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. . . [A]bsent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority."). Here, there clearly was not a "substantial likelihood" that the contents of Arrington's suitcase had changed between the time his luggage was lawfully searched and the time of seizure minutes later.

## IV. Motion to Dismiss

Title 18, § 983(a)(3)(A) of the U.S. Code provides that a civil forfeiture complaint shall be filed in accordance with the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims, namely Rule G(2), which requires that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." This means the government "must allege sufficient facts to support a reasonable belief that the property is subject to forfeiture." *United States v. Mondragon*, 313 F.3d 862, 867 (4th Cir. 2002).

Arrington argues that dismissal is warranted, not based on any pleading deficiency under Rule G(2), but because evidence of the currency should be suppressed, which he argues would be fatal to the Complaint. As noted, "the mere fact that property was illegally seized does not immunize that property from forfeiture." *One 1977 Mercedes Benz*, 708 F.2d at 450. Thus, a motion to dismiss is properly considered a separate inquiry from a motion to suppress. However, given that the Court has denied Arrington's Motion to Suppress in this Order, Arrington's sole basis for seeking dismissal of the Complaint also fails. In any event, the Court finds that the government's Complaint clearly "state[s] sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."

Arrington's Motion to Dismiss must likewise be denied.

## V.  Conclusion

For the foregoing reasons, Arrington's Motion to Suppress and Motion to Dismiss (Dkt. No. 8) are hereby DENIED.

/s/
Liam O'Grady
United States District Judge

July 30, 2010
Alexandria, Virginia